## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOSEPH BENJAMIN BENN, | ) | |
| | ) | |
| Plaintiff, | ) | **AMENDED COMPLAINT** |
| | ) | |
| v. | ) | Civil No. 1:22-cv-00820-GTS-ATB |
| | ) | |
| DIANE NEAL, | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, JOSEPH BENJAMIN BENN ("Plaintiff" or "Mr. Benn"), by his attorneys, Stenger, Diamond & Glass, LLP and Cullen and Dykman LLP, as and for his Amended Complaint against Defendant, DIANE NEAL ("Defendant" or "Ms. Neal"), respectfully alleges as follows:

### OVERVIEW OF THE ACTION

1.      This is an action for breach of a so-ordered Stipulation of Settlement, defamation, and related relief. As detailed below, Defendant has engaged in a prolonged and repeated press campaign to destroy the life, reputation, and livelihood of her ex-boyfriend, Mr. Benn. This campaign began when Defendant gave an interview and arranged for the publication of a vicious smear article in "The Daily Beast" (see **Exhibit A** annexed hereto) and planned and participated in a podcast entitled "Strictly Stalking," in which she maliciously characterized Mr. Benn as a cold-blooded abuser who, among other things, maims pets—a shockingly defamatory piece that quickly spread across the internet to other tabloids. However, the disturbing truth is that it is Defendant—*not* Mr. Benn—who was the abuser in this relationship, to the point of threatening to murder Mr. Benn and the couple's dog Charlie, as evidenced by Defendant's own chilling words as stated to Mr. Benn:

*You know what? I am going to fucking murder Charlie in front of you. I am going to kill him in front of you. Charlie, I'm going to kill you. I'm going to shoot you in the head in front of your daddy so your brains go all over him. Maybe just maybe then you can elicit some sort of emotion from this fucking android. I hate you. (sigh)*

2.    She also threatened Mr. Benn with his life:

*How would you like to die? Would you like to be lit on fire like alive? Carbon monoxide? That could be very easy while you're up in the office. You wouldn't even know because you're such a dick even though I spent $100 each on your carbon monoxide detectors and your fire alarm, you didn't even put them up you bitch. That's all you had to do. You didn't have to buy them you didn't have to pick them out. You didn't have to research them. You didn't have to do anything. You just had to fucking put 2 screws in the god damn wall. Too hard for JB. Fucking you deserve to die. How would you like to see Charlie die? Do you want it to be painful? Do you want me to strangle the life out of him in front of you. Do you want me to hang him ... just a little bit? So he's almost dead and then pull him down and do it again? How would you like to watch Charlie die? How would you like to die?*

3.    As described below, Defendant conducted a smear campaign against Mr. Benn, resulting in devastating damages to Mr. Benn, including but not limited to, loss of income and damage to his reputation and the complete destruction of his career as a renowned magician.

## THE PARTIES, JURISDICTION AND VENUE

4.    Plaintiff is a domiciliary of the State of New York, with an address of 77 Reichel Road, Hurley, New York 12443.

5.    Upon information and belief, Defendant is a domiciliary of the State of New York, with an address of 190 Beach 69th Street, Apartment 4K, Arverne, New York 11692.

6.    This Court has personal jurisdiction over the parties pursuant to CPLR 301.

7.    Venue is proper in Supreme Court, Ulster County pursuant to CPLR 503(a) because Mr. Benn resides in Ulster County and because the incidents which form the basis for

the claims herein occurred primarily in Ulster County.

8.      The Supreme Court, Dutchess County has exclusive jurisdiction over this action as a consequence of the agreement of the parties made in open court in a stipulation dated January 7, 2020 and "So Ordered" at the request of the parties (the "Settlement Stipulation").  (See **Exhibit B**).

### FACTUAL BACKGROUND

9.      Prior to the actions giving rise to this litigation, Benn had a strong and successful career as a world-renowned magician who performed in commercial and intimate settings.

10.     Ms. Neal was an actress for a period of time. She starred as DA Casey Novak in the Law & Order: SVU series through 2012. Since then, her appearances have been sporadic.

11.     Ms. Neal and Mr. Benn began dating each other in or around December 2013.

12.     At that time, Ms. Neal was in the process of litigating her divorce from her now ex- husband.

13.     During the course of their relationship, Mr. Benn found and paid cash for a home located at 77 Reichel Road in Hurley, New York (the "Property") on or about June 9, 2015. It was intended to be used as a vacation/second home. New York City remained his primary residence.

14.     Mr. Benn invited Ms. Neal to spend time with him at the Property. He continued to work as an artist. This involved extensive travel. Ms. Neal stayed there in his absence.

15.     During this time period, Ms. Neal's work as an actress was drying up. She was not able to obtain a full-time position on the Law & Order: SVU show she had worked on, or to get work on other projects.

16.     Ms. Neal grew depressed during this time. Ms. Neal's emotional outbursts were frequent and disturbing, alternating between threats to kill Benn (or their dog), and long tirades

3

where she would continuously scream at and berate Benn.

17.     The relationship continued to degrade to a point where in or around March 2018, the couple broke up and Ms. Neal moved out of Benn's home to 28 Main Street, Hurley, NY, where she rented a house.

18.     Ms. Neal's rage then took the form of successive lawsuits, each more outrageous than the last. Even before she moved out of the house, on or about March 23, 2018, Ms. Neal filed a civil court matter in Supreme Court, Ulster County (the "First Action"). A copy of the summons and complaint for same is annexed hereto as **Exhibit C**. The factual crux of Ms. Neal's claims in the First Action was that, although Mr. Benn was the only person on the deed for the Property, Ms. Neal allegedly had an oral agreement with Mr. Benn to eventually become a co-owner and be added to the deed.

19.     In the First Action, Ms. Neal made no mention of any alleged sexual assault, animal abuse, or many of the other supposed bad acts that she would later accuse Mr. Benn of in subsequent lawsuits or in the Daily Beast Article (see **Exhibit A**). Instead, Ms. Neal only sought an equitable or monetary share of the value of the Property.

20.     While the First Action was ongoing, Ms. Neal also filed criminal proceedings against Mr. Benn in Ulster County (the "Criminal Proceedings"). During the Criminal Proceedings, Mr. Benn denied each and every one of Ms. Neal's allegations, including her allegations that Mr. Benn drove past her rental home 30 to 40 times a day. The apparent goal of the Criminal Proceedings was to leave Mr. Benn with a criminal record, which never resulted.

21.     Ms. Neal also filed a Petition with the Ulster Family Court (the "Family Court Action") on or about March 28, 2018, a mere five days after the filing of the First Action. (See **Exhibit D**.) In that Petition, Ms. Neal alleged that:

a. Mr. Benn cashed bank checks in Ms. Neal's name
b. Mr. Benn used Ms. Neal's credit cards without her consent;
c. Mr. Benn altered the contact information of Ms. Neal's electronic contacts in an effort to isolate her;
d. Mr. Benn locked Ms. Neal out of the Property and threatened to destroy the personal property she had left there;
e. In her first description of an alleged sexual assault, Ms. Neal falsely alleged that "[p]rior to preventing [her] from entering or remaining on the shared [Property]," on or about "March 9, 2018," Mr. Benn entered her bedroom while she was asleep and digitally penetrated Plaintiff without her consent, after which she awoke, commanded Mr. Benn out of the room, and called out to a family member for help;
f. Mr. Benn was defaming Ms. Neal to her associates, and was using menacing language to intimidate Ms. Neal; and that
g. Ms. Neal had not yet filed a criminal complaint concerning these incidents.

22.     In the Family Court Action, Ms. Neal sought an Order of Protection, which she was granted. Mr. Benn filed his own petition in Family Court and was also granted an Order of Protection. No other relief was granted in either Ms. Neal's or Mr. Benn's Family Court actions. It appears Ms. Neal then abandoned that lawsuit.

23.     Ms. Neal took the raw materials from her First Action and Family Court Action and remolded them into a new set of allegations and filed a third lawsuit (the "Third Action"). A copy of the summons and complaint in the Third Action is attached. (See **Exhibit E**).

24.     In the Third Action, Ms. Neal alleged that:

a. Mr. Benn had a long-term plan to "con her out of her possessions, her home, her livelihood and her relationships";
b. Ms. Neal contributed an escrow payment "and hundreds of thousands of dollars in capital investments and put hundreds of hours of labor" into the Property in reliance on promises she would be recognized as an owner of same;
c. Ms. Neal ended her romantic relationship with Mr. Benn on or about March 3, 2018;
d. On March 10, 2018, Ms. Neal, while sleeping in a locked bedroom in the Property, was awakened by Mr. Benn digitally penetrating her and holding a cellphone, in an attempt to capture a video of the attack, following which Ms. Neal screamed in protest and confronted Mr. Benn about the attack and insisted he leave the room;

5

e.   Ms. Neal went to law enforcement authorities and has continued to follow up with same about this alleged attack;

f.   A new allegation that Mr. Benn verbally and physically abused Ms. Neal on or about February 18, 2018;

g.   Mr. Benn used Ms. Neal's credit cards without her consent, and took bank checks from her checkbook with an intent to defraud her;

h.   Mr. Benn allowed Ms. Neal to expend money and time on the Property, relying on Mr. Benn's representations that she would be a co-owner, while secretly attempting to sell the Property (and buying or attempting to buy another home), thus entitling Ms. Neal to damages under a theory of fraud;

i.   Mr. Benn defamed Ms. Neal;

j.   Mr. Benn allegedly breached a contract to allow Ms. Neal to move her items out of the Property and out of Mr. Benn's Manhattan apartment (though Ms. Neal now admitted she had movers come and move her personal items out of the Property);

k.   Mr. Benn prevented relatives of Ms. Neal's (who are  powerful and well connected in the entertainment industry," according to Ms. Neal) from accessing Mr. Benn's Manhattan apartment, cut Ms. Neal off from her personal and professional contacts, and thus intentionally or negligently caused Ms. Neal severe emotional distress; and,

l.   Some combination of the above-referenced allegations constituted, in the alternative, a prima facie tort.

25.    Upon information and belief, Ms. Neal's motive in filing these multiple litigations was to damage Mr. Benn's reputation because she grew impatient with the pace of the Courts. Upon information and belief, that is why she later gave the interview to the Daily Beast. Ms. Neal took it upon herself to use the press to accomplish what she will never be able to do in Court where *evidence*—as opposed to manufactured falsehoods—is required to establish her case.

## THE DAILY BEAST ARTICLE

26.    To that end, upon information and belief, on or about November 12, 2019, and in advance of seeking to file an amended complaint in her Second Action against Mr. Benn (and before requisite leave of Court was even requested for such filing), Ms. Neal worked with at least one reporter at the Daily Beast, supplying false and defamatory statements about Mr. Benn to said reporter(s), which then formed the content of an article, published on November 13, 2019 (**Exhibit A**) (the "the Article"). A copy of the Article is also available on the Daily Beast's

website at: https://www.thedailybeast.com/law-and-order-actress-says-magician-ex-stalked-and-assaulted-her-maimed-her-pets.

27.     Upon information and belief, Ms. Neal intended the aforesaid interviews and statements with The Daily Beast to be published and disseminated far and wide, in the hopes that Mr. Benn's career would be destroyed.

28.     The Article was published online on November 13, 2019.

29.     The Article contained, among other things, brand new, false and defamatory allegations that Mr. Benn abused Ms. Neal in ways that she never mentioned the first time she sued Mr. Benn for emotional distress, including that he maimed animals.

30.     The Article was then picked up by other outfits such as The Daily Mail, People Magazine, Radar Online, Page Six, PerezHilton.com, Canoe, and Yahoo Entertainment.

31.     Ms. Neal arranged for her "story" to be published, and this was followed by a second article in the Daily Beast, dated November 16, 2019 (hereinafter, "the Second Article"), further describing the parties' tumultuous relationship.  (See **Exhibit F**).

32.     The Article and the Second Article are so scandalous that they all but ruined any chance that Mr. Benn would ever have to work as a professional (and highly successful) magician, and permanently tarnished Mr. Benn in the public eye, with the apparent intent of turning Mr. Benn into a social pariah. Upon information and belief, these were Ms. Neal's goals.

33.     In the Article, Mr. Benn's professional history is discussed at length and ridiculed.

34.     In the Article, Ms. Neal also reveals the names of Mr. Benn's celebrity clients, ensuring that not only would those names be made part of a very negative and very public news story, but that they would be contacted for comment, further injuring Mr. Benn's ability to make a living.

35.     Ms. Neal's actions of giving the interview and providing information for the

Article were done with the intention of harming Mr. Benn's career.

36.     Ms. Neal's statements in the Article are false.

37.     On information and belief, Ms. Neal determined that since her initial Court actions did not yield the desired result of destroying Mr. Benn through legal process, she would wield the press as the instrument for Mr. Benn's destruction by manufacturing stories of abuse and violence so salacious that the tabloids would likely lap it all up—which they did—necessitating litigation to clear Mr. Benn's name and to provide him with redress based on the devastation Ms. Neal has wreaked on Mr. Benn's reputation and career.

## THE DEFAMATORY STATEMENTS

38.     Defendants' false and defamatory statements were specifically designed to injure and damage, if not completely destroy, Mr. Benn's professional career as a magician.

39.     Set forth below is each defamatory statement published online by The Daily Beast on November 13, 2019 (many of which were statements that were echoed, quoted, paraphrased and/or summarized in the days immediately following, including on The Daily Mail and People Magazine websites) based on information furnished by, on behalf of and/or at the direction of Ms. Neal.

### A. False and Defamatory Statements Regarding Ms. Neal's Claim to An Ownership Interest in the Property

40.     Ms. Neal gave the following false and defamatory information to the Daily Beast regarding her false claim to an ownership interest in the Property, which then appeared in the Article:

   a.   "According to Ms. Neal's lawsuit, Benn refused to put her on the title to a secluded home they purchased together in upstate New York."
   b.   "It's a fitting specialty for a man who now stands accused of actually forcing someone from their house."
   c.   "According to Ms. Neal, the couple planned to move upstate, putting offers on homes as early as June 2014."

8

    d.  "That fall, according to Ms. Neal's lawsuit, Benn was aware of Ms. Neal's considerable assets and successfully persuaded Ms. Neal to consider purchasing residential property in the Hudson Valley."

    e.  "One year later, they bought a $529,900 home . . . ."

## B.   The False Claim That Mr. Benn Stole All of Ms. Neal's Possessions

41.   Ms. Neal gave the following false and defamatory information to the Daily Beast regarding her false claim that Mr. Benn stole all of her possessions, which then appeared in the Article:

    a.  "After the actress fled, Benn refused to allow her to recover her belongings and furniture from their upstate home and his New York apartment, the lawsuit states."

## C.   The "Dangerous Con Artist," Thief and Abuser Allegations

42.   Ms. Neal gave the following false and defamatory information to the reporter(s) at the Daily Beast regarding Mr. Benn being a "dangerous con artist," thief and abuser, which then appeared in the Article:

    a.  "'Law and Order' Actress Says Magician Ex Stalked and Assaulted Her, Maimed Her Pets."

    b.  "According to litigation that started last year, she claims Benn was a dangerous con artist who targeted her, isolated her, physically and sexually abused her, and worked to dismantle her career."

    c.  "In an amended complaint filed Wednesday against Benn as part of a nearly two-year court battle, the 43-year-old actress describes him as a 'manipulative and maniacal fraudster' who allegedly 'defrauded her of millions' and 'violently inflicted emotional distress' on her via 'a campaign of isolation, terror and (physical and sexual) assault', and destroyed her reputation by doing so." Ms. Neal claims that Mr. Benn sent emails and text messages impersonating her to her friends and entertainment contacts; threatened her; abused her . . . ."

    d.  "Looking back now, Ms. Neal claims Benn enjoyed 'unfettered access to her home office, her computer, and even her finances'";

    e.  "The longer the relationship went on, Benn became more entangled in Ms. Neal's friendships and business affairs."

    f.  "If a friend was trying to reach her, they'd call Benn and he'd say 'Oh, Diane's on set. Just tell me and I'll pass it on. But he never relayed these messages, Ms. Neal says.'"

    g.  "But she said she'd soon unearth more disturbing revelations about the man who'd been her partner."

    h.  "In early 2018, while Benn was traveling, Ms. Neal discovered documentation in

Benn's home office in the [upstate] Hurley Residence that revealed that Benn—without Ms. Neal's knowledge or consent—had fraudulently transferred monies from her bank accounts, stolen her personal checks, and used her credit-card accounts to pay for his personal expenses,' Ms. Neal's amended complaint alleges."

i.   "In total, Benn has robbed Ms. Neal of hundreds of thousands of dollars."

j.   "Ms. Neal would also discover that Benn had secretly transferred the title of her car to himself in October 2014, the complaint states."

k.   "In the interview, Ms. Neal said she was vacationing in Peru with a friend when Benn allegedly stole her vehicle."

l.   And Benn changed the trigger locks to her firearms, stripping her of any means of protecting herself", the complaint all goes."

## D. <u>The Pet Allegations</u>

43.    Ms. Neal gave the following false and defamatory information to the Daily Beast

regarding her false claims about Mr. Benn harming her pets, which then appeared in the Article:

a.   Ms. Neal claims that Mr. Benn "intentionally harmed her pets".

b.   "In the complaint, Ms. Neal says the magician slashed her beloved toy poodle's throat, and told her that a cat caused the injury."

c.   "Benn, the complaint says, also allegedly 'bragged' that he 'bashed the cat's brains in.' (Ms. Neal told The Daily Beast her feline vanished while it was nursing kittens.)

d.   "'Benn - in order to deter Ms. Neal from leaving him or crossing him - slit the throat of Ms. Neal's dog, Father Ted,' Ms. Neal's lawsuit states."

e.   "'Benn's explanation was incredible: claiming Ms. Neal's cat had attacked Father Ted.'"

f.   "Kitty Kyle, a nursing mother cat that Ms. Neal took in as a stray, vanished soon afterward. The kittens started to disappear, too, Ms. Neal claims in her lawsuit."

g.   "In January 2018, the lawsuit adds, 'Benn broke the back of Ms. Neal's other dog, leaving the dog severely handicapped.'"

h.   "Ms. Neal told The Daily Beast her vet ruled Winnie, the toy poodle, had suffered a  severed spine from blunt-force trauma."

## E. <u>The Assault Allegations</u>

44.    Ms. Neal gave the following false and defamatory information to the Daily Beast

regarding her false claims about Mr. Benn assaulting her, which then appeared in the Article:

a.   "On another occasion, Ms. Neal's lawsuit states, she awoke to Benn sexually assaulting her while appearing to record the act on his cellphone. This alleged attack came days after Ms. Neal broke up with Benn in March 2018."

b.   "More disturbingly, Ms. Neal claims Benn physically and sexually abused her

on several occasions."

c.  "In August 2017, Ms. Neal's amended complaint states, 'Benn instigated an argument with Ms. Neal, then violently assaulted her, repeatedly kicking her. Benn left Ms. Neal bruised on the floor. After Ms. Neal begged that Benn leave the home, Benn refused and spent the remainder of the evening in the driveway [in] order to prevent her from fleeing.'"

d.  "In an interview, Ms. Neal said, 'I'm so upset because it's the first time that anyone has raised a hand to me... and it wasn't a hand, by the way. He never uses his hands. He kicks.'

e.  "Benn, who was allegedly watching from a vehicle in the driveway, flashed the car's lights and revved the engine while filming her."

f.  "'I thought he was going to run me over,' Ms. Neal said. 'I'm screaming, 'Leave Just leave''

g.  "According to Ms. Neal, Benn physically attacked her a second time that Thanksgiving, as they planned to drive into the city to spend the holiday with friends."

h.  "'Benn offered to drive her, and encouraged Ms. Neal to take a muscle relaxant,' the amended complaint states, but then 'refused to drive Ms. Neal to the gathering ... after a brief verbal argument, Benn again attacked Ms. Neal, again kicking her until she was black and blue.'"

i.  "Ms. Neal's lawsuit alleges Benn abused her on a third occasion in February 2018, kicking her repeatedly while wearing a pair of hiking boots - an attack that caused 'widespread contusions and/or hematomas' on both of her legs."

j.  Ms. Neal told The Daily Beast that Benn sent Colleen and Kong away for a long lunch, then physically assaulted her in their absence." 'He kicks the bejeezus out of me. I'm begging, 'Why? What do I have to do to get away from you?' Ms. Neal recalled."

k.  "Ms. Neal says that when Kong and her mom returned from lunch, 'Evelien and I sit there and she wants to talk. I'm upset but it's almost more humiliating to just admit that you'd just take it and not run... I didn't tell anyone that he kicked the shit out of me. I just said we got into a huge argument. I was humiliated for anyone to know I'd literally had my ass kicked three times and taken it.'"

l.  "Finally, in March 2018, Ms. Neal's complaint alleges, the actress woke to Benn sexually assaulting her."

m.  "She said the magician was digitally penetrating her vagina with one hand, while holding a cellphone in another."

n.  "She screamed and woke her sister Leigh, who was visiting the house at Ms. Neal's request for protection."

45.  Online readers' comments on the Articles demonstrate the damage that Ms. Neal's

defamatory statements have done to Mr. Benn's reputation. Examples include the following:

Rob: He must have been doing a magic act

Robert F: If he did these things to the dog and cat he deserves to die.

11

GahdAllNightly: Abracadabra, watch me pull a rabbit out of my hat? More like Abracastabya, watch me abuse a dog and a cat

JTflyer:    animal abuse is a federal felony now. If its true, and he's convicted, make an example of him.

Stanfyre: I think it should be more often in the news so many women or men are suffering from abuse. They keep it hidden. I think there should be more education of the young to explain things like narcissism. You get in the relationship and it sneaks up on you. 15 years later you are not allowed even to speak to your dying Grandma.

Spacemattermatters: He doesn't deserve to breathe the same air as the animals. Diane, he may be a magician but there are people you can consult with that will make him disappear.

pafrake: How do you know? He violated a restraining order about a hundred times in a span 15 minutes and there's plenty of proof for that so the authorities have obviously been involved in at least some of her listed complaints. Thank goodness they had no kids together as they probably would have had their throats slashed too.

XENO55: Any man that beats a woman hates women. Ifhe kills pets hes a sociopath. Please call the police.

46.    These comments represent a small sample of hundreds that have been made by readers in the wake of the Article's publication.

47.    As a result of the Article, Mr. Benn's career has been damaged, if not destroyed.

48.    In just the few days after the Article was published, Mr. Benn had at least three work cancellations because of the Article. Long-term clients cancelled and many others would not return calls. As of the date of this Complaint, Mr. Benn remains entirely unemployable in his professional field.

49.    On November 16, 2019, the Second Article was published online, in which a link was provided to the original Article.

50.    On or about November 19, 2019, Mr. Benn filed an action against Ms. Neal in Supreme Court, Ulster County, captioned *Joseph B. Benn v Diane Neal*, Index No. EF2019-3832

(the "Benn Action"), asserting claims for defamation arising from the Article and the Second Article. A copy of the complaint in the Benn Action is attached as **Exhibit G**.

### THE OPEN COURT SETTLEMENT IN THE BENN ACTION

51.     On January 7, 2020, the parties and their counsel appeared in Supreme Court, Ulster County regarding the Benn Action and Ms. Neal's two separate actions against Mr. Benn.

52.     After discussions which occurred over the course of several hours in court, the parties agreed to a global settlement, on the record on January 7, 2020, which was "so ordered" by the Court on February 4, 2020 ("the Settlement Stipulation"). Annexed hereto and made a part hereof as **Exhibit B** is the so-ordered  transcript of the Settlement Stipulation.

53.     The Settlement Stipulation provided, among other things, that Ms. Neal would retract all of her defamatory statements about Mr. Benn in a press release, admitting that they were not true, but rather, the product of emotions running high, and that the parties agreed to a full non-disclosure agreement and would refrain from any further disparagement of the other.

54.     In particular, the Settlement Stipulation provided as follows:

> "It is agreed there will be complete non-disclosure of both sides of anything related to the lawsuit and the subject matter of the settlement, including through the parties or anyone acting on their behalf, surrogates or anyone acting directly or indirectly for their benefit"

> "It is understood that the parties are agreeing to mutual non-disparagement and to maintaining the full confidentiality to the maximum extent, interpreted to be interpreted [*sic*] to the maximum extent possible, and that the events that gave rise to the subject of the litigation, as well as the parties' relationship, would not be the subject of disclosure or the subject of any fiction or nonfiction or fictionalized telling thereof. In addition, relating to such subject matter, in the event of a material breach of that provision that would also trigger the affidavit of confession being able to be filed by either side, depending on which side is determined to be in breach."

> That if ever asked about their relationship, they each would defer

to the joint press release and state that, "Prior to and during the course of litigation, allegations were made by Ms. Neal and Mr. Benn against one another, including that Mr. Benn maimed animals, that Ms. Neal was an alcoholic and drug addict, that Mr. Benn assaulted Ms. Neal, and that Ms. Neal suffers from mental illness, that were emotionally charged and untrue. The parties have resolved the dispute among them and are looking forward to moving on with their lives."

55.    Mr. Benn agreed to pay a certain sum of money to Ms. Neal, specifically because she agreed to retract her statements and stop disparaging and defaming him, which had already damaged his reputation and career.

56.    The Settlement Stipulation is a binding contract by and between Mr. Benn and Ms. Neal. The Court subsequently "So Ordered" the Settlement Stipulation, providing a judicial mechanism for its enforcement, and did not change its material effect as a contract between the parties. The parties, and the Court through its "so-order" agreed that Supreme Court, Ulster County would "retain jurisdiction over the settlement."

## MS. NEAL IMMEDIATELY BREACHES THE SETTLEMENT STIPULATION

57.    Upon Mr. Benn's return home on the day of the Settlement Stipulation, he found that his home had been broken into it and several things stolen, including his dog ("the Burglary").

58.    Ms. Neal's close friend, Samantha Swanson, eventually pleaded guilty to the crime of third-degree felony burglary regarding the Burglary.

59.    Samantha Swanson knew that Mr. Benn would not be home because he would be in court on January 7, 2020.

60.    Upon information and belief, Ms. Neal had been in communication with Samantha Swanson prior to the Settlement Stipulation and informed her that Mr. Benn would not be home for several hours on the day of the settlement.

61.    Upon information and belief, Ms. Neal had orchestrated, conspired with, and/or

encouraged Samantha Swanson to undertake the Burglary.

62.     Mr. Benn, believing that Ms. Neal had orchestrated the Burglary, did not make payment under the Settlement Stipulation but rather, awaited the outcome of the police investigation and then pursued a motion to find that Ms. Neal had abandoned the Settlement Stipulation.

63.     Ms. Neal pursued a motion to enforce the payment terms of the Settlement Stipulation, despite having never satisfied her obligation to retract her defamatory statements about Mr. Benn.

64.     On March 1, 2021, Supreme Court, Ulster County issued a Decision and Order finding that the Settlement Stipulation was not abandoned by Ms. Neal. A copy of the March 1, 2021 Decision and Order is attached as **Exhibit H**.

## THE MARCH 2, 2021 PODCAST

65.     On March 2, 2021, the day after the aforesaid Decision and Order, a podcast in which Ms. Neal was the guest was released/published (the "First Podcast").

66.     The First Podcast was entitled "Strictly Stalking."

67.     The First Podcast had been recorded in advance of the date of its publication.

68.     The First Podcast had been promoted by Ms. Neal while her motion seeking to enforce the Settlement Stipulation was still pending.

69.     The First Podcast was promoted by Ms. Neal to gain attention in advance of Ms. Neal's latest acting endeavor, which was to appear in a Lifetime channel movie entitled, "Circle of Deception" in which she plays a former beauty queen involved with a murderous and manipulative boyfriend.

70.     In the First Podcast, Ms. Neal was presented as a stalking victim. She spoke for nearly an hour. During the course of the First Podcast, Ms. Neal repeated nearly every false and

defamatory statement alleged to have been made by her, of Mr. Benn, in the Article.

71.    Although Ms. Neal deliberately did not mention Mr. Benn's name in the First Podcast, she referred to him as "the trickster Voldemort," discussed how they met, and gave other information specific enough for listeners to be able to easily know that she was referring to Mr. Benn, especially given her past statements about Mr. Benn in the Article.

72.    Mr. Benn learned of the First Podcast from a friend. That friend heard the Podcast and told him that he needed to listen to it because it was about him and it was full of disparaging statements.

73.    Anyone with access to the internet would know Ms. Neal was talking about Mr. Benn in the First Podcast, as a simple search in "Google," or another search engine, with the words "Diane Neal" and "stalker" will produce several articles in which Ms. Neal's defamatory statements are repeated, and photographs of Ms. Neal and Mr. Benn appear.

74.    Upon information and belief, anyone who knew either of Ms. Neal or Mr. Benn, including past employers who had cancelled engagements with Mr. Benn, or potential employers waiting for time to pass before considering future employment, would not have needed the internet to confirm that Ms. Neal was referring to Mr. Benn in the First Podcast.

75.    In the First Podcast, Ms. Neal alleged false, horrible behavior on the part of Mr. Benn and describes herself as a person who, even now, currently lives in fear for her life as a consequence of Mr. Benn's presence on this earth. Among the many false, defamatory statements she made about Mr. Benn in the First Podcast are the following (hereinafter, "the Podcast Statements"):

    a.  That he "hunts" and stalks her "24/7"
    b.  "Every time I tried to leave, one of my pets would be maimed" (this allegation was one of the specific allegations addressed in the Settlement that the parties agreed to tell the public, in a news release, was untrue)

c.   That "he bragged about smashing their [cat's] head in with a baseball bat and letting me think she was missing"

d.   That he "stole one of my cars"

e.   That he "stole" her "family heirlooms, these gemstones that had been left to me by people who had scrapped and scrounged and saved and got them out of the Holocaust";

f.   That he followed her to the trooper's station and the District Attorney's office

g.   "Every time I look out and I can't even flee because he's watching"

h.   That he was "cyberstalking [her] forever" and is "in [her] phone"

76.   The First Podcast contains additional false and defamatory statements made by Ms. Neal about Mr. Benn, all of which are reflected in the transcript of the First Podcast, attached hereto and made a part of this Complaint as **Exhibit I**.

77.   The First Podcast was nationally broadcast on March 2, 2021.

78.   Ms. Neal's false and defamatory statements about Mr. Benn in the First Podcast were violations of the Settlement Stipulation.

**THE CONTEMPT MOTION AND THE RETWEET**

79.   On or about April 20, 2021, Mr. Benn brought a motion in Supreme Court, Ulster County seeking to hold Ms. Neal in violation of the Settlement Stipulation and contempt of court for violating her agreement not to disparage Mr. Benn through her statements in the First Podcast (the "First Contempt Motion").

80.   In connection with Mr. Benn's aforesaid motion, this Court executed an "order to show cause" on April 20, 2021 with a temporary restraining order directing both parties to, among other things, "refrain from discussing this matter or any underlying matter in connection herewith with anyone other than their respective counsel, and shall refrain from posting anything pertaining to the other party or the matters underlying this proceeding on social media" while Mr. Benn's motion was pending (the "TRO"). A copy of the April 20, 2021 Order to Show Cause with TRO is attached as **Exhibit J**.

81.   While Mr. Benn's motion was pending, on or about May 2, 2021, Ms. Neal posted

a "retweet" on her verified Twitter account which advertised and promoted the First Podcast and provided a link to the First Podcast. The re-tweet promoted the First Podcast. It may be viewed at: (https://www.dropbox.com/s/ywk7h6o0mo9bylr/Retweet%20Video.mp4?dl=0). A copy of the retweet is attached as **Exhibit K**.

82.     Ms. Neal's aforesaid retweet violated the TRO's directive that Ms. Neal "refrain from posting anything pertaining to the other party or the matters underlying this proceeding on social media." (Ex. **J** at 3). As a result of Ms. Neal's violation of the TRO, Mr. Benn filed a second contempt application on July 13, 2021 (See **Exhibit L**) (the "Second Contempt Motion").

## MS. NEAL'S THIRD VIOLATION OF THE COURT'S ORDER

83.     On September 13, 2021, Ms. Neal participated in a second podcast. The podcast was titled "Special Survivors Unit" and was hosted by Sarah Devin, a social news gathering reporter at NBC News.  A copy of a transcript of the September 13, 2021 podcast is annexed has **Exhibit M** (the "Second Podcast").

84.     In the podcast, she made the following statements:

a.  "And, you know, it's amazing trying to get law enforce ---- like, the thing that blows me away the most is, like, the first thing I did was go to the police, obviously, and I reported all the crimes with a ton of corroborating evidence, even, like, recordings and everything.  I mean, anything that could - - - anything that could help, witness testimonies."
b.  "And the time spent in my case is dealing with, you know, totally crap law enforcement and lawyers, you know, and trying to get justice for something that nobody gives a damn about, because the truth is people don't really give a damn about women."
c.  "Like in my case the district attorney was convening a grant jury finally to do all these crimes and then he got violently ill, went into the hospital, never came out of the hospital.  They had to have a selection and a new DA, so there's just a new D.A. and I'm trying to put pressure on this new DA to take up the case."
d.  "And I think, as I look at it, it's very strange, because, like you were mentioning before, you had a crime done to you, it wasn't your fault.  And no none is going to blame someone for having their car stolen, but you're going to blame something for being --- (Interrupted).  Oh yeah, amazing, and nobody takes it seriously.  The amount of --- because mine happened in upstate New York, right, so this is very small town Trump country, that kind of area, and

every law enforcement officer, like misogynistic and old."

e. "This is a very dangerous individual who did an incredible amount of very, very illegal things over a very long period of time, very easily could have ended up in my life being over."

f. "And I'd like to not be murdered.  That's kind of the reason why I went forward, is because I --- then went to the cops, is because I'd like to not be killed."

g. "And I have to say, like, after being stalked horrifically, because you live in such isolation like, . . ."

85. Although the putative purpose of the Second Podcast was to discuss the effect of stalking and/or other sexual abuse on women generally, Ms. Neal made reference, again, to her own alleged stalking and/or sexual abuse story, which she first published in the Article. At pages 21 through 24 of the transcript, Ms. Neal identifies the location of her trauma as being a small upstate town, and although not mentioning Mr. Benn by name, makes it clear that her abuser lived in "Trump Country" and was a serious threat to her life. As she did on March 2, 2021 during the First Podcast, she identified Mr. Benn without mentioning his name.

86. Although Ms. Neal did not repeat Mr. Benn's name, any person who was reasonably curious as to the identity of the person who threatened to murder Defendant in a small town in upstate New York, somewhere around Kerhonkson, would need do nothing more than a Google search for Defendant and find all of her defamatory statements made of Mr. Benn in the Daily Beast article as repeated by her in her First Podcast, which remains available online, and which said podcast and article were the subject of her retweet.

**SUPREME COURT'S DETERMINATION OF THE CONTEMPT PPLICATION**

87. On March 2, 2021, May 1, 2021, and September 15, 20201, Ms. Neal repeated the defamatory statements previously made by her in the 2019 Daily Beast Article, as well as additional defamatory statements made by her in the First Podcast and the Second Podcast, all of which served to bring those statements to the attention of an audience which might otherwise

have not known of the same for the same effect as was the original audience to the Daily Beast articles.

**A. Supreme Court's Decision of March 29, 2022**

88.    On March 29, 2022, Supreme Court, Ulster County rendered its Decision in connection with Ms. Neal's participation in the First Podcast (the "March 29 Decision"). A copy of the March 29 Decision is annexed hereto and made a part hereof as **Exhibit N**. The Court found that Ms. Neal's participation in the First Podcast constituted a "material breach" of the Settlement Stipulation. In addition to making this finding, the Court held Defendant in civil contempt for violating the Settlement Stipulation.

89.    Specifically, the Court found as follows:

> During the interview, plaintiff discussed at length conduct she clearly attributed to the defendant.  Such allegations included statements that he "hunts" and stalks her "24/7", when she tried to leave him her pets would be maimed or disappear, that he changed locks on their upstate residence, stole her car, followed her to the police station and District Attorney's office and cyberstalked her.  While plaintiff did not mention the defendant by name, she did refer to the individual as the "trickster of Voldemort." Based on the defendant's profession, the celebrity status of the parties and cognizant of the procedural and factual history of this litigation, it is clear to the Court that plaintiff was referring to the defendant in making these allegations during the March 2, 2021 interview.

90.    Defendant did not file an appeal from the March 29 Decision determining that she was in "material breach" of the Settlement Stipulation. The Court's found that although she did not blame Benn directly, that she intended, and did so, indirectly.  Defendant's time to appeal the March 29 Decision has expired and it is therefore binding upon her in this action.

**B. The Determination of the Retweet**

91.    In connection with Mr. Benn's contempt motion before Supreme Court, Ulster County, the Court ordered a hearing to determine whether or not Defendant retweeted the First Podcast. The hearing was held on June 2, 2022. On her own volition, Ms. Neal did not appear at

the hearing. The Court made its Decision on June 22, 2022. A copy of that Decision is annexed hereto and made a part hereof as **Exhibit O** (the "June 22 Decision").

92.     In the June 22 Decision, the Court found that Ms. Neal retweeted the First Podcast based on the unrefuted testimony of Joseph Benjamin Benn. The Court then held Ms. Neal in civil and criminal contempt (Ex. **O** at 6).

93.     Ms. Neal appealed the June 22 Decision on or about July 22, 2022. To date, Ms. Neal has not perfected her appeal.

**C. The September 12, 2021 Podcast**

94.     The Court made its Decision on the Second Contempt Motion on June 28, 2022. A copy of that Decision is annexed hereto and made a part hereof as **Exhibit P** (the "June 28 Decision").

95.     In the June 28 Decision, the Court found that Ms. Neal's participation in the Second Podcast was a violation of the TRO and the Settlement Stipulation. Notwithstanding that determination, the Court, in an exercise of judicial restraint, declined to hold Ms. Neal in contempt an additional and third time.

96.     Ms. Neal did not take an appeal from the June 28 Decision. The time within which she may do so has long since expired. As a consequence, and upon information and belief, the Court's finding that she was in "material breach" of the Stipulation remains binding upon the parties.

**THE PODCAST OF APRIL 11, 2022**

97.     On April 11, 2022, Defendant Neal published another podcast (the "Third Podcast"). The Third Podcast podcast may be heard at (https://podcasts.apple.com/us/podcast/hear-say-diane-neal/id1604994153).

98.     Between two and three minutes into the podcast, Defendant described the Plaintiff as her "convicted stalker" from whom she was "on the lam."

99.     At the time of making this statement, Defendant actually knew that Mr. Benn was not convicted of being a stalker let alone of anything else. Defendant knew the statement to be false when she made it. Upon information and belief, Defendant knew that the statement would keep alive the narrative of defamation that she started in November of 2019.

100.    Defendant made the statements in the Third Podcast with the intention of continuing to defame Benn's personal reputation. These statements constituted slander and libel *per se.*

## AS AND FOR A FIRST CAUSE OF ACTION

101.    Plaintiff repeats and realleges each and every allegation mentioned and set forth above as if set forth at length and verbatim herein.

102.    The Settlement Stipulation is a binding contract by and between the parties to this litigation.  (See **Exhibit B**).

103.    On March 2, 2021, Defendant Neal breached her contract with Plaintiff Benn when she participated in the First Podcast.

104.    On May 1, 2021, Ms. Neal breached the contract between her and Mr. Benn when she engaged in the retweet of the podcast in which she participated on March 2, 2021.

105.    On September 12, 2021, Ms. Neal breached her contract with Mr. Benn when she participated in the Second Podcast.

106.    On April 11, 2022, Ms. Neal breached her contract with Mr. Benn when she participated in the Third Podcast.

107.    The object of the contract between the Plaintiff and the Defendant was to avoid further damage to Mr. Benn's reputation as a consequence of the defamatory statements made by

Ms. Neal of Plaintiff Benn in the Article and which she repeated, in sum and substance, in the First Podcast, the Second Podcast, and the Third Podcast.

108.  Supreme Court, Ulster Country has exclusive jurisdiction over its so-ordered Settlement Stipulation.

109.  As a direct and proximate result of Defendant's breach of the Settlement Stipulation, Plaintiff has been and will continue to be damaged in an amount that will be proven at trial, but is believed to be in excess of $10 Million Dollars, in light of the destruction of the object of the contract between them by the Defendant.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>

110.  Plaintiff repeats and realleges each and every allegation mentioned and set forth above as if set forth at length and verbatim herein.

111.  Defendant made false statements regarding Mr. Benn in the Second and Third Podcasts that are actionable as defamation.

112.  Defendant caused these defamatory statements to be published without privilege or authorization, and her defamatory statements were widely distributed and made to countless third parties.

113.  Defendant's defamatory statements are set forth above and incorporated herein and were of and concerning Plaintiff, or sufficiently identified Plaintiff.

114.  Defendant's statements constitute defamation *per se.* Defendant caused her defamatory statements to be published in podcasts that were widely distributed. Defendant knew her statements were false when made.

115.  Defendant's false and defamatory statements were published with the intent to harm Plaintiff's good name and reputation, and to injure or damage Plaintiff's business, trade or profession by falsely accusing Plaintiff of criminal acts.

23

116.    Defendant published these false and defamatory statements with actual malice and knowledge that the statements were false, or with reckless disregard as to whether they were false or not.

117.    Since their initial circulation, the defamatory statements published by Defendant regarding Plaintiff have remained available to countless numbers of listeners.

118.    Plaintiff has no means of ascertaining the names of all the persons who heard the defamatory statements in the Second Podcast and the Third Podcast.

119.    In carrying out the aforementioned conduct, Defendant acted negligently, willfully, maliciously, and/or with reckless indifference to the consequences of her actions against Plaintiff.

120.    As a direct and proximate result of Defendant's intentional and malicious publication of the false and defamatory statements in the Second Podcast and the Third Podcast, Plaintiff has been and will continue to be damaged in an amount that will be proven at trial but believed to be in excess of $10 Million Dollars in light of the career-ending impact of Defendant's misconduct.

121.    Additionally, Defendant should be made to pay punitive damages, in an amount deemed sufficient by the trier of fact, because her aforementioned conduct was conscious, deliberate, intentional, and/or reckless in nature, was undertaken in a state of mind which evidence hatred, ill will, or a spirit of revenge, and carried out with a conscious disregard for the rights of other persons and has a great probability of causing substantial harm.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Prima Facie Tort)

122.    Plaintiff repeats and realleges each and every allegation mentioned and set forth above as if set forth at length and verbatim herein.

123.    Defendant, by and through her statements and publication of the defamatory statements above, intentionally and/or recklessly intended to harm Plaintiff's reputation and business.

124.    Such a publication carries no First Amendment protection as a matter of law and the dissemination of such a corrosive publication constitutes a prima facie tort.

125.    These publications of the defamatory above Defendant were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

126.    Plaintiff has suffered and continues to suffer injury to his business and reputation as a result of the publication of the defamatory statements by Defendant.

127.    Defendant's aforementioned actions were the direct and proximate cause of Plaintiff's injuries.

128.    Plaintiff continues to suffer damages to his business and reputation, all to his damage in an amount that will be proven at trial, but believed to be in excess of 10 Million Dollars, plus punitive damages.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant as follows:

A.  On the First Cause of Action, damages in an amount to be determined at trial but believed to be in excess of $10 Million Dollars, plus punitive damages; and

B.  On the Second Cause of Action, damages in an amount to be determined at trial but believed to be in excess of $10 Million Dollars, plus punitive damages; and

C.  On the Third Cause of Action, damages in an amount to be determined at trial but believed to be in excess of $10 Million Dollars, plus punitive damages; and

D.  The costs and fees of this action, including reasonable attorneys' fees; and

E.  Such other and further relief as the Court deems just and proper.

DATED:      Wappingers Falls, NY
            September <u>12</u>, 2022

                                         <u> /s/ Kenneth M. Stenger</u>
                                         Kenneth M. Stenger, Esq.
                                         STENGER, DIAMOND & GLASS, LLP
                                         *Attorneys for Plaintiff*
                                         1136 Route 9
                                         Wappingers Falls, NY  12590
                                         (845) 298-2000
                                         Kstenger@sdglaw.com

                                         <u>(application for admission *pro hac vice* to be</u>
                                         <u>made promptly)</u>


                                         <u>/s/ Nicholas J. Faso</u>
                                         Nicholas J. Faso, Esq.
                                         CULLEN AND DYKMAN LLP
                                         *Attorneys for Plaintiff*
                                         80 State Street, Suite 900
                                         Albany, NY  12207
                                         (518) 788-9416
                                         nfaso@cullenllp.com

## VERIFICATION

STATE OF NEW YORK      )
                              ) ss.:
COUNTY OF DUTCHESS  )

      JOSEPH BENJAMIN BENN, being duly sworn deposes and says:

      I am the Plaintiff in this action.  I have read the annexed Amended Complaint, know the

contents thereof, and the same are true to my knowledge, except those matters that are stated to

be alleged upon information and belief, and as to those matters, I believe them to be true upon

my own investigation and knowledge.

_____
Joseph Benjamin Benn

Sworn to before me on this
22nd day of August, 2022

_____
Notary Public

KENNETH M. STENGER
Notary Public, State of New York
No. 02ST4648576
Qualified in Duchess County
Commission Expires September 21, 2025